**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **JOSHUA WOLF, individually, on behalf of himself, and all others similarly situated,**<br><br>***Plaintiff***<br><br>**v.**<br><br>**CGM, LLC; CGM, INC.; and CGM MANAGEMENT, INC. D/B/A CGM, INC.**<br><br>***Defendants*** | **Civil Action No.**<br><br>____________________ |

## CLASS ACTION COMPLAINT

Plaintiff, JOSHUA WOLF (hereinafter, "Plaintiff"), individually, on behalf of himself, and all others similarly situated, for his causes of action against Defendants, CGM, LLC, CGM, INC., and CGM MANAGEMENT, INC. D/B/A CGM, INC. (collectively, "Defendants" or "CGM"), alleges upon personal knowledge as to his own actions, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. This action arises out of Defendants' unauthorized disclosure of the confidential personal information, Personally Identifying Information[1] ("PII") of Plaintiff and the proposed Class Members, approximately 279,063 persons, from December 15, 2022 to December 28, 2022 in a cyberattack on CGM's systems, including their names, driver's license or state identification numbers, and Social Security numbers (the "Data Breach").[2]

2. CGM, headquartered in Roswell, Georgia, provides services to wireless and broadband telecommunications companies to assist them in participating in the Affordable Connectivity Program (ACP) and Lifeline Program, federal benefit program(s) assisting individuals with obtaining broadband internet and related services.[3]

---

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8).

[2] *See*: CGM Notice of Data Event to Maine Attorney General, including sample notice to consumers (Ex. A) ("Data Breach Notice") available at https://apps.web.maine.gov/online/aeviewer/ME/40/fdc0a65c-9a4c-401a-b278-5a83284956c7.shtml (last acc. June 15, 2023) **attached as Exhibit 1**

[3] *See* CGM website, available at https://www.cgmllc.net/; https://www.fcc.gov/acp (last acc. June 15, 2023).

3. In connection with performing these services, CGM collects massive amounts of PII regarding their customers and their clients, including Plaintiff and the Class Members.

4. On information and belief, CGM failed to undertake adequate measures to safeguard the PII of Plaintiff and the proposed Class Members, including failing to implement industry standards for data security, and failing to properly train employees on cybersecurity protocols, resulting in the Data Breach.

5. Although CGM discovered the Data Breach on or about December 28, 2022, Defendants failed to notify and warn Data Breach victims of the unauthorized disclosure of their PII until June 7, 2023[4].

6. As a direct and proximate result of Defendants' failures to protect Plaintiff's and the Class Members' sensitive PII and warn them promptly and fully about the Data Breach, Plaintiff and the proposed Class have suffered widespread injury and damages necessitating Plaintiff seeking relief on a class wide basis.

[4] *See* Maine Attorney General, CGM Data Breach Notification to Maine Attorney General, available at https://apps.web.maine.gov/online/aeviewer/ME/40/fdc0a65c-9a4c-401a-b278-5a83284956c7.shtml (last acc. June 15, 2023).

## PARTIES

7. Plaintiff is a natural person, and resident and citizen of the State of California with a primary residence in Los Angeles, California in Los Angeles County where he intends to remain, and a victim of Defendants' Data Breach.

8. CGM, LLC, is a limited liability company organized and existing under the laws of the State of Georgia with a principal place of business located at 104 Sloan Street, Roswell, Georgia 30075 in Fulton County. CGM, LLC's Registered Agent for service of process is Kevin Murphy, 104 Sloan Street, Roswell, Georgia 30075.

9. On information and belief, CGM, Inc., is a corporation organized and existing under the laws of the State of Georgia with a principal place of business located at 104 Sloan Street, Roswell, Georgia 30075 in Fulton County.

10. CGM Management Services, Inc. d/b/a CGM, Inc. is a corporation organized and existing under the laws of the State of Georgia with a principal place of business located at 104 Sloan Street, Roswell, Georgia 30075 in Fulton County. CGM Management Services, Inc.'s Chief Executive Officer, Chief Financial Officer, and Registered Agent for service of process is Chuck Campbell, 104 Sloan Street, Roswell, Georgia 30075.

11. On information and belief, CGM, LLC, CGM, INC., and CGM Management Services, Inc. d/b/a CGM, Inc. (collectively, "Defendants" or "CGM") are *alter egos* of one another.

## JURISDICTION AND VENUE

12. This Court has personal jurisdiction over Defendants because, personally or through their agents, Defendants operate, conduct, engage in, or carry on a business in this state; they maintain their principal places of business and headquarters in Georgia; and committed tortious acts in Georgia.

13. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than one hundred (100) members in the proposed Class, and at least one member of the class is a citizen of a state different from Defendants.

14. The Court has supplemental jurisdiction over Plaintiff's claims arising under state law under 28 U.S.C. § 1367.

15. Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because Defendants reside in this district and a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this district.

## FACTUAL BACKGROUND

### A. Defendants CGM

16. Founded in 1997, CGM is a company which "help[s] wireless and broadband companies participate in the federal Affordable Connectivity Program (ACP) and Lifeline Program," including "…deliver[ing] tools to confirm subscriber eligibility, enroll low-income households, track agent and distribution activity, calculate and file federal and state reimbursements, and provide audit support to our Service Provider clients."[5]

17. The ACP is a Federal Communications Commission ("FCC") benefit program for low income and eligible persons which "helps ensure that households can afford the broadband they need for work, school, healthcare and more," providing eligible participants with discounts towards internet services, and computers.[6]

18. The Lifeline Program, instituted in 1985, and as revised in 2016, is an FCC program assisting low income consumers in affording access to telephone and internet services.[7] As described by the FCC, "Lifeline provides subscribers a

---

[5] https://www.cgmllc.net/ (last acc. June 15, 2023).
[6] Federal Communications Commission website, "Affordable Connectivity Program," available at https://www.fcc.gov/acp (last acc. June 15, 2023).
[7] https://www.fcc.gov/general/lifeline-program-low-income-consumers (last acc. June 15, 2023).

discount on qualifying monthly telephone service, broadband Internet service, or bundled voice-broadband packages purchased from participating wireline or wireless providers [… to] ensure that low-income consumers can afford 21st century broadband and the access it provides to jobs, healthcare, and educational resources."[8]

19. CGM assists telecommunications communicating in participating in the ACP and Lifeline programs, providing services including: program compliance through a "Subscriber Enrollment Platform" which "connects to a number of third-party and private billing systems, has successfully navigated over a thousand FCC and state audits, and maintains on-going compliance with ever-changing federal and state regulations and rule interpretations[;]" monthly reimbursement filings; "audit support services," including "pulling together data necessary to respond to the myriad of audits Service Providers receive each year," and training on program compliance; as well as providing a "CGM Distribution Management Database (DMD)."[9]

20. To provide these ACP and Lifeline enrollment and reimbursement filing services, CGM requires that their customers, including program applicants and participants, provide their and their customers PII to Defendant, including their

[8] FCC website, "Lifeline Support for Affordable Communications," avail. at https://www.fcc.gov/lifeline-consumers (last acc. June 15, 2023).
[9] https://www.cgmllc.net/ (last acc. June 15, 2023).

names, driver's license or state identification numbers, and Social Security numbers, either directly or through their telecommunications clients.

21. In exchange for this information, CGM promises to safeguard their client's customers' PII, and to only use this confidential information for authorized purposes.

22. Defendants acknowledge the importance of properly safeguarding the private data and PII of individuals, stating in the Data Breach Notice (Ex. A, sample notice), that "[w]e take this event and the obligation to safeguard the information in our care very seriously."[10]

23. Plaintiff and the proposed Class Members are current and former customers of CGM's telecommunications clients, and of CGM itself, and would not have allowed their PII to be entrusted to Defendants had they known CGM would not adequately safeguard that information.

24. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and the proposed Class Members' PII, Defendants assumed legal and equitable duties to Plaintiff, and the members of the Proposed Class, and knew or should have known that they were responsible for protecting his and their PII from unauthorized disclosure.

[10] *See* sample notice, **Exhibit 1.**

25. At all times Plaintiff and the members of the Proposed Class, have taken reasonable steps to maintain the confidentiality of their PII; and, Plaintiff and the proposed Class Members, relied on Defendants to keep their PII confidential and securely maintained.

**B. CGM Fails to Adequately Safeguard PII—the Data Breach**

26. Plaintiff and the proposed Class Members are current and former customers of CGM and of their telecommunication clients, whose personal information, PII, was entrusted to CGM, directly or indirectly, in connection with Defendants' ACP and Lifeline program services.

27. CGM collected and maintained this PII in their computer information technology systems and networks.

28. On information and belief, from December 15, 2022, and December 28, 2022, CGM's systems network was unauthorizedly accessed by an unknown cybercriminal during an external system breach hacking attack, resulting in the compromise and disclosure and the PII of their telecommunications clients' customers, including Plaintiff and the proposed Class Members, that was stored therein, including their names, driver's license or state ID numbers, and Social

Security numbers—the Data Breach.[11]

29. According to Defendants, "[o]n December 28, 2022, CGM observed unusual activity related to certain systems within its information technology network," after which it conducted an investigation showing that "an unauthorized actor may have accessed a limited amount of information stored on CGM's systems between December 15, 2022, and December 28, 2022," "assess[ed] the security of [their] systems."[12]

30. Thereafter, on information and belief, CGM, through a third-party "external data analytics specialist," further investigated and reviewed the potentially affected data to determine "whether any sensitive information was accessed and to whom the data relates to," which was completed by March 23, 2023.[13]

31. Following the three (3)-month investigation, Defendants identified those individuals whose PII was impacted in the Data Breach and their "respective data owners," Defendants' telecommunications clients, and began notifying these data owners/clients of the Data Breach beginning on April 15, 2023.[14]

32. As of "…May 18, 2023, CGM [had] received approval from data

---

[11] *See* Notice of Data Event to Maine Attorney General, **Exhibit 1**.
[12] *See Id.*
[13] *See Id.*
[14] *See Id.*

owners to provide notice to affected individuals and regulatory authorities on their behalf."[15]

33. Despite over five (5) months having passed since CGM initially identified the Data Breach, only beginning on or about June 7, 2023, did CGM began sending written notices to affected persons notifying them of the Data Breach[16] (hereinafter, "Data Breach Notice") [17].

34. Defendants' Data Breach Notice on or about June 7, 2023 to affected consumers generally described the occurrence of the Data Breach, but failed to explain *when* the cyberattack occurred (December 15th to 28th, 2022), the nature of the cyberattack, or how the cyberattack was perpetrated (i.e., an external system breach (hacking) attack), obfuscating the nature of the Data Breach.[18]

35. Further, the Data Breach Notice stated that after discovering the Data Breach, CGM "review[ed] and enhance[ed] existing policies and procedures relating to data protection and security [and] instituted additional security measures to minimize the likelihood of similar events in the future." [19]

---

[15] *See Id.*
[16] *See Id.*
[17] *See*: Notice of Data Event to Maine Attorney General, **Exhibit 1**; sample notice to Vermont Attorney General, attached as **Exhibit 2.**
[18] *See Id.*
[19] *See Id.*

36. CGM's Data Breach Notice admitted that affected consumers' PII, including their names, driver's license or state ID numbers, and Social Security numbers were subject to unauthorized access in the Data Breach.[20]

37. The Data Breach Notice was careful to qualify, in bold and underlined type, that "…**we have no evidence of misuse of your personal information**," downplaying the severity and consequences of the Data Breach, but encouraged affected victims to "remain vigilant against incidents of identity theft and fraud by reviewing account statements and monitoring [their] free credit reports for suspicious activity and to detect errors," to report such fraud to law enforcement, and informed them of their abilities to place a fraud alert on their credit files and a credit freeze on their credit reports.[21]

38. CGM offered victims of the Data Breach credit monitoring and identity theft protection services through TransUnion for either twelve (12) or twenty-four (24) months.[22]

39. Only on or about June 7, 2023 did Defendants provide notification of the Data Breach to regulatory authorities, including the Maine Attorney General and Vermont Attorney General, reporting to the Maine Attorney General that the Data

[20] *See Id.*
[21] *Id.*
[22] *See Id.*

Breach occurred on December 15, 2022; that it involved an "external system breach (hacking)" attack; inconsistently, that it was discovered on May 18, 2023; that 279,063 persons were affected; and that the information acquired included full names in combination with "Driver's License Number or Non-Driver Identification Card Number."[23]

40. Defendants did not have adequate security protocols to prevent, detect, and stop the cybercriminals from executing the cyberattack on CGM's systems and accessing the voluminous PII of Plaintiff and the proposed Class Members in the Data Breach.

41. Further, CGM failed to adequately train their employees on reasonable cybersecurity protocols and failed to implement reasonable security measures, causing it to lose control over individuals' PII in the Data Breach.

42. Defendants' tortious conduct and breach of contractual obligations, as explained hereinafter, are evidenced by their failure to recognize the Data Breach until cybercriminals had already accessed the data, meaning CGM had no effective means to detect and prevent attempted data breaches.

43. As a result of CGM's Data Breach, its victims face a lifetime risk of

---

[23] *See* CGM Data Breach Notification to Maine Attorney General, avail. at https://apps.web.maine.gov/online/aeviewer/ME/40/fdc0a65c-9a4c-401a-b278-5a83284956c7.shtml (last acc. June 15, 2023).

identity theft, as it includes sensitive information that cannot be changed, like their Social Security numbers. Accordingly, CGM's identity theft protection through TransUnion is wholly insufficient to compensate Plaintiff and the Class Members for their damages caused by the Data Breach.

44. Indeed, as a result of the Data Breach which Defendants permitted to occur by virtue of their inadequate data security practices, Plaintiff and the proposed Class Members have suffered injury and damages, as set forth herein.

**C. Plaintiff's Experience**

45. Plaintiff signed-up for the Affordable Connectivity Program ("ACP") six (6) to eight (8) months ago in late 2022, approximately, through Assurance Wireless, and later Q Link Wireless.

46. On information and belief, CGM manages the ACP verification and enrollment for Assurance Wireless, and/or Q Link Wireless.

47. In connection with Defendants' ACP program services, Plaintiff's sensitive PII was entrusted and disclosed to CGM.

48. On or about June 12, 2023, Plaintiff received CGM's Data Breach Notice, informing him that his name and Social Security Number had been compromised in the Data Breach.

49. To his knowledge, Plaintiff has never been the victim of a prior data breach.

50. As a direct result of the Data Breach, Plaintiff has suffered or will imminently suffer injury from the unauthorized disclosure and misuse of his PII that can be directly traced to Defendant.

51. On information and belief, Plaintiff's PII unauthorizedly disclosed in the Data Breach is now in the possession of cybercriminals and/or on the Dark Web where it can be sold and utilized for fraudulent and criminal purposes.

52. In addition, Plaintiff must now spend time and effort attempting to remediate the harmful effects of the Data Breach, including monitoring his credit reports, and fears for his personal financial security and uncertainty over the information compromised in the Data Breach. He is experiencing feelings of anxiety, sleep disruption, stress, and fear because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

53. Plaintiff was highly disturbed by the Data Breach's nature and the thought of cybercriminals accessing his highly sensitive PII and the harm caused by the Data Breach.

54. As a result of CGM's Data Breach, Plaintiff faces a lifetime risk of additional identity theft, as it includes sensitive information that cannot be changed, like his Social Security number.

**D. This Data Breach was Foreseeable by CGM.**

55. Plaintiff's and the proposed Class Members' PII was provided to CGM with the reasonable expectation and mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access. By failing to do so, Defendants put all Class Members at risk of identity theft, financial fraud, and other harms.

56. Defendants tortiously failed to take the necessary precautions required to safeguard and protect the PII of Plaintiff and the Class Members from unauthorized disclosure. Defendants' actions represent a flagrant disregard of Plaintiff's and the other Class Members' rights.

57. Plaintiff and Class Members were the foreseeable and probable victims of Defendants' inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing PII and the critical importance of providing adequate security for that information.

58. Cyber-attacks against companies such as Defendants are targeted and frequent. Indeed, according to UpGuard, "[c]ybercriminals know that tech

companies often have weaker data protection and overall cybersecurity measures than highly-regulated industries, like healthcare and finance. Instead of targeting these organizations directly for their valuable data, they focus their efforts on the poor data security often found in the first link of the supply chain – tech vendors that store and manage significant amounts of data from these industries."[24]

59. According to the Identity Theft Resource Center's January 24, 2022 report for 2021, "the overall number of data compromises (1,862) is up more than 68 percent compared to 2020. The new record number of data compromises is 23 percent over the previous all-time high (1,506) set in 2017. The number of data events that involved sensitive information (Ex: Social Security numbers) increased slightly compared to 2020 (83 percent vs. 80 percent)."[25]

60. The increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industry, including CGM.

---

[24] UpGuard, Catherine Chipeta, "5 Ways Tech Companies Can Prevent Data Breaches," updated Mar. 2, 2023 available at https://www.upguard.com/blog/how-tech-companies-can-prevent-data-breaches (last acc. Jun. 15, 2023).

[25] *See* "Identity Theft Resource Center's 2021 Annual Data Breach Report Sets New Record for Number of Compromises," Jan. 24, 2022, available at https://www.idtheftcenter.org/post/identity-theft-resource-center-2021-annual-data-breach-report-sets-new-record-for-number-of-compromises/ (last acc. Apr. 14, 2023).

According to IBM's 2022 report, "[f]or 83% of companies, it's not if a data breach will happen, but when."[26]

61. Based on data from the Maine Attorney General, as of August 2022, "…at least 79 financial service companies have reported data breaches affecting 1,000 or more consumers, and the total number of consumers affected by these breaches could be as high as 9.4 million."[27]

62. PII is of great value to hackers and cybercriminals, and the data compromised in the Data Breach can be used for a variety of unlawful and nefarious purposes, including ransomware and fraudulent misuse, and sale on the Dark Web.

63. PII can be used to distinguish, identify, or trace an individual's identity, such as their name, Social Security number, and financial records. This can be accomplished alone, or in combination with other personal or identifying information that is connected, or linked to an individual, such as their birthdate, birthplace, and mother's maiden name.

[26] IBM, "Cost of a data breach 2022: A million-dollar race to detect and respond," available at https://www.ibm.com/reports/data-breach (last acc. Apr. 14, 2023).

[27] Carter Pape, "Breach data from Maine shows scope of bank, credit union exposures," American Banker, August 24, 2022, available at https://www.americanbanker.com/news/breach-data-from-maine-shows-scope-of-bank-credit-union-exposures

64. Given the nature of the Data Breach, it was foreseeable that the compromised PII could be used by hackers and cybercriminals in a variety of different injurious ways. Indeed, the cybercriminals who possess Plaintiff's and the Class Members' PII can easily obtain their tax returns or open fraudulent credit card accounts in the Class Members' names.

**E. CGM Failed to Comply with FTC Guidelines**

65. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

66. In 2016, the FTC updated its publication, *Protecting PII: A Guide for Business*, which establishes cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of PII that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the

system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[28]

67. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[29]

68. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

69. These FTC enforcement actions include actions against entities failing to safeguard PII such as Defendants. *See, e.g.*, *In the Matter of LabMD, Inc., A Corp*,

---

[28] *See* Federal Trade Commission, October 2016, "Protecting Private information: A Guide for Business," available at https://www.bulkorder.ftc.gov/system/files/publications/2_9-00006_716a_protectingpersinfo-508.pdf (last acc. Apr. 14, 2023).

[29] *See id*.

2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

70. CGM failed to properly implement basic data security practices widely known throughout the industry. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to customer PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

71. Defendants were at all times fully aware of their obligations to protect the PII of Plaintiff and the Class Members. CGM was also aware of the significant repercussions that would result from their failure to do so.

**F. CGM Fails to Comply with Industry Standards**

72. A number of industry and national best practices have been published and are widely used as a go-to resource when developing an institution's cybersecurity standards.

73. The Center for Internet Security's (CIS) CIS Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including 18 Critical Security Controls of Inventory and

Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.[30]

74. In addition, the National Institute of Standards and Technology (NIST) recommends certain practices to safeguard systems, *infra,* such as:

- Control who logs on to your network and uses your computers and other devices.
- Use security software to protect data.
- Encrypt sensitive data, at rest and in transit.
- Conduct regular backups of data.
- Update security software regularly, automating those updates if possible.

[30] *See* Rapid7, "CIS Top 18 Critical Security Controls Solutions," available at https://www.rapid7.com/solutions/compliance/critical-controls/ (last acc. June 8, 2023).

- Have formal policies for safely disposing of electronic files and old devices.
- Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.[31]

75. Further still, the Cybersecurity & Infrastructure Security Agency makes specific recommendations to organizations to guard against cybersecurity attacks, including (1) reducing the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing] that software is up to date, prioritizing updates that address known exploited vulnerabilities identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and other steps; (2) taking steps to quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior [and] [e]nabl[ing] logging in order to better investigate issues or events[;] [c]onfirm[ing] that the organization's entire network

[31] Federal Trade Commission, "Understanding The NIST Cybersecurity Framework," https://www.ftc.gov/business-guidance/small-businesses/cybersecurity/nist-framework (last acc. Apr. 14, 2023).

is protected by antivirus/antimalware software and that signatures in these tools are updated," and (3) "[e]nsur[ing] that the organization is prepared to respond if an intrusion occurs," and other steps.[32]

76. Upon information and belief, CGM failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, as well as failing to comply with other industry standards for protecting Plaintiff's and the proposed Class Members' PII, resulting in the Data Breach.

## G. The Data Breach Caused Plaintiff and the Class Members Injury and Damages

77. Plaintiff and members of the proposed Class have suffered injury and damages from the misuse of their PII that can be directly traced to CGM, that has occurred, is ongoing, and/or imminently will occur.

---

[32] Cybersecurity & Infrastructure Security Agency, "Shields Up: Guidance for Organizations," available at https://www.cisa.gov/shields-guidance-organizations (last acc. June 8, 2023).

78. As stated prior, in the Data Breach, unauthorized cybercriminals were able to access the Plaintiff's and the proposed Class Members' PII, which is now available to be imminently used for fraudulent purposes or has been sold for such purposes, causing widespread injury and damages.

79. The ramifications of CGM's failure to keep Plaintiff's and the Class's PII secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, or other information, such as addresses, without permission, to commit fraud or other crimes.

80. Because CGM failed to prevent the Data Breach, Plaintiff and the proposed Class Members have suffered, will imminently suffer, and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. Plaintiff and the Class Members have suffered, will imminently suffer, or are at an increased risk of suffering:

a. Fraudulent misuse of PII;

b. The loss of the opportunity to control how PII is used;

c. The diminution in value of their PII;

d. The compromise and continuing publication of their PII;

e. Out-of-pocket expenses associated with the prevention,

detection, recovery, and remediation from identity theft or fraud;

f. Lost opportunity costs and lost wages associated with the time and effort expended addressing and trying to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

g. Delay in receipt of tax refund monies;

h. Increase in spam texts and telephone calls;

i. Unauthorized use of stolen PII; and

j. The continued risk to their PII, which remains in the possession of CGM and is subject to further breaches so long as CGM fails to undertake the appropriate measures to protect the PII in their possession.

81. Furthermore, the Data Breach has placed Plaintiff and the proposed Class Members at an increased risk of fraud and identity theft.

82. There are myriad dangers which affect victims of identity theft, including: cybercriminals opening new financial accounts, credit cards, and loans in victim's names; victim's losing health care benefits (medical identity theft); hackers taking over email and other accounts; time and effort to repair credit scores; losing

home due to mortgage and deed fraud; theft of tax refunds; hackers posting embarrassing posts on victim's social media accounts; victims spending large amounts of time and money to recover their identities; experiencing psychological harm and emotional distress; victims becoming further victimized by repeat instances of identity theft and fraud; cybercriminals committing crimes in victim's names; victims' personal data circulating the Dark Web forever; victims receiving increased spam telephone calls and emails; victims' children or elderly parents having their identities stolen.[33]

83. The FTC recommends that identity theft victims take time and effort intensive or costly steps to protect their personal and financial information after a data breach, including contacting the company where the fraud occurred and asking them to close or freeze accounts and changing login information; contacting one of the credit bureaus to place a fraud alert on credit files (consider an extended fraud alert that lasts for 7 years if someone steals their identity); reviewing their credit

[33] *See* Gaetano DiNardi, Aura.com, "How Bad Is Identity Theft? Is It Serious?" (December 14, 2022) available at https://www.aura.com/learn/dangers-of-identity-theft#:~:text=Fraudsters%20can%20open%20new%20accounts,to%20repair%20your%20credit%20score (last acc. Feb. 27, 2023).

reports; seeking a credit freeze; correcting their credit reports; and other steps such as contacting law enforcement and reporting the identity theft to the FTC.[34]

84. Identity thieves use stolen PII such as Social Security numbers for a variety of crimes, including credit card fraud—just as occurred here—phone or utilities fraud, and bank/finance fraud.

85. Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information.

86. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive other services in the victim's name, and may even give the victim's PII to police during an arrest—resulting in an arrest warrant being issued in the victim's name. That can be even more problematic and difficult to remedy for someone who already has a criminal record.

87. Further, according to the Identity Theft Resource Center's 2021 Consumer Aftermath Report, identity theft victims suffer "staggering" emotional tolls: For example, nearly 30% of victims have been the victim of a previous identity

---

[34] *See* Federal Trade Commission, available at https://www.identitytheft.gov/Steps (last acc. June 8, 2023).

crime; an all-time high number of victims say they have contemplated suicide. 35% reported not having enough money to pay for food and utilities, while 14% were evicted because they couldn't pay rent or their mortgage. 54% percent reported feelings of being violated.[35]

88. What's more, theft of PII is also gravely serious outside of the traditional risks of identity theft. In the last two decades, as more and more of our lives become interconnected through the lens of massively complex cloud computing, PII is valuable property.[36]

89. The value of sensitive information is axiomatic; one need only consider the value of Big Data in corporate America, or that the consequences of cyber theft include heavy prison sentences. Even the obvious risk to reward analysis of cybercrime illustrates beyond doubt that PII has considerable market value.

90. It must also be noted there may be a substantial time lag–measured in years–between when harm occurs versus when it is discovered, and also between

[35] Jason Steele, *Credit Card and ID Theft Statistics*, CreditCards.com (June 11, 2021), avail. at https://www.creditcards.com/statistics/credit-card-security-id-theft-fraud-statistics-1276/ citing Identity Theft Resource Center, "2021 Consumer Aftermath Report," May 26, 2021 available at https://www.idtheftcenter.org/post/the-identity-theft-resource-centers-2021-consumer-aftermath-report-reveals-impacts-on-covid-19-identity-crime-victims/ (last acc. Feb. 27, 2023).

[36] *See, e.g.*, John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private information") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

when PII and/or financial information is stolen and when it is used.

91. PII are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

92. Where the most PII belonging to Plaintiff and Class Members was accessible from CGM's network, there is a strong probability that entire batches of stolen information have been dumped on the black market, and are yet to be dumped on the black market, meaning Plaintiff and the Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiff and the Class Members must vigilantly monitor their financial accounts for many years to come.

93. Social Security numbers are among the worst kind of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud.[37]

[37] *See* U.S. Social Security Administration, "Identity Theft and Your Social Security Number," Publication No. 05-10064, July 2021, available at https://www.ssa.gov/pubs/EN-05-10064.pdf (last acc. Feb. 25, 2023)

94. For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines. Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[38] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

95. Moreover, it is not an easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[39]

---

[38] *See id.*

[39] *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR, Brian Naylor, Feb. 9, 2015, http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited September 1, 2021).

96. This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[40]

102. Accordingly, the Data Breach has caused Plaintiff and the proposed Class Members a greatly increased risk of identity theft and fraud, in addition to the other injuries and damages set forth herein, specifically the unauthorized disclosure, lost time and efforts in remediating the impact of the Data Breach, and other injury and damages as set forth in the preceding paragraphs.

103. CGM knew or should have known of these harms which would be caused by the Data Breach they permitted to occur, and strengthened their data systems accordingly.

## CLASS ALLEGATIONS

114. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

---

[40] *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, Tim Greene, Feb. 6, 2015, http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited June 13, 2023).

115. Plaintiff brings this nationwide class action individually and on behalf of all other persons similarly situated pursuant to Rule 23(a) of the Federal Rules of Civil Procedure, and Fed. R. Civ. P. 23(b)(3).

116. Plaintiff proposes the following Class definition ("Nationwide Class"), subject to amendment based on information obtained through discovery:

**All persons whose PII was compromised as a result of the Data Breach experienced by CGM beginning on or about December 15, 2022, including all persons who received Defendants' Data Breach Notice.**

117. In addition, or in the alternative, Plaintiff proposes the following state class ("California Class") (together with the Nationwide Class, the "Class"):

**<u>California Class:</u>**

**All California residents whose PII was compromised as a result of the Data Breach experienced by CGM beginning on or about December 15, 2022, including all persons who received Defendants' Data Breach Notice.**

118. Excluded from the Class are Defendants' members, officers, directors, and employees; any entity in which Defendants have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendants. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families, and members of their staff.

119. Plaintiff reserves the right to amend the definition of the Class or add a

class or subclass if further information and discovery indicate that the definition of the Class should be narrowed, expanded, or otherwise modified.

120. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of Class Members' claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims for each Class Member.

121. This action satisfies the requirements for a class action under Fed. R. Civ. P. 23(a)(1)-(3) and Fed. R. Civ. P. 23(b)(2), including requirements of numerosity, commonality, typicality, adequacy, predominance, and superiority.

122. **Numerosity, Fed. R. Civ. P. 23(a)(1):** The members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, based on information and belief, the PII of approximately 279,063 individuals was compromised in the Data Breach. Such information is readily ascertainable from Defendants' records.

123. **Commonality, Fed. R. Civ. Proc. 23(a)(2), and Predominance, Fed. R. Civ. Proc. 23(b)(3):** There are numerous questions of law and fact common to the Class. As such, there is a well-defined community of interest among the Members of the Class. These questions predominate over questions that may affect only individual Class Members because CGM has acted on grounds generally

applicable to the Class. Such common legal or factual questions include, but are not limited to:

a. Whether Defendants unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' PII;

b. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

d. Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations including, *e.g.*, the FTC Act;

e. Whether computer hackers obtained Plaintiff's and Class Members' PII in the Data Breach;

f. Whether Defendants knew or should have known that their data security systems and monitoring processes were deficient;

g. Whether CGM failed to adequately respond to the Data Breach, including failing to timely notify the Plaintiff and the Class

Members;

h. Whether Defendants' failures amounted to negligence;

i. Whether Defendants breached their contractual promises;

j. Whether Defendants were unjustly enriched;

k. Whether Defendants intruded into the private affairs of Plaintiff and the Class Members;

l. Whether Plaintiff and the Class Members suffered legally cognizable damages as a result of Defendants' misconduct;

m. Whether Defendants' acts violated the law, and;

n. Whether Plaintiff and the Class Members are entitled to damages including compensatory and punitive damages, and/or injunctive relief.

124. **Typicality, Fed. R. Civ. P. 23(a)(3):** The claims or defenses of Plaintiff are typical of the claims or defenses of the proposed Class because Plaintiff's claims are based upon the same legal theories and same violations of law. Plaintiffs' claims are typical of those of other Class Members because Plaintiff's PII, like that of every other Class Member, was compromised in the Data Breach, and all arise from the same set of facts regarding CGM's failures:

a. to protect Plaintiff's and Class Members' PII;

b. to discover and remediate the security breach of its computer systems more quickly; and

c. to disclose to Plaintiff and Class Members in a complete and timely manner information concerning the security breach and the theft of their Personal Information.

125. **Adequacy, Fed. R. Civ. P. 23(a)(4):** Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff's Counsel are competent and experienced in litigating class actions.

126. **Superiority, Fed. R. Civ. P. 23(b)(3):** A class action is a superior method for the fair and efficient adjudication of this controversy because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, and joinder of the Class Members is otherwise impracticable. Class treatment presents a superior mechanism for fairly resolving similar issues and claims without repetitious and wasteful litigation for many reasons, including the following:

a. It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions. Many members of the Class are not in the position to incur the expense and hardship of retaining their own counsel to prosecute

individual actions, which in any event might cause inconsistent results.

b. When the liability of Defendants has been adjudicated, the Court will be able to determine the claims of all members of the Class. This will promote global relief and judicial efficiency in that the liability of Defendants to all Class Members, in terms of money damages due and in terms of equitable relief, can be determined in this single proceeding rather than in multiple, individual proceedings where there will be a risk of inconsistent and varying results.

c. A class action will permit an orderly and expeditious administration of the Class claims, foster economies of time, effort, and expense, and ensure uniformity of decisions. If Class Members are forced to bring individual suits, the transactional costs, including those incurred by Defendants, will increase dramatically, and the courts will be clogged with a multiplicity of lawsuits concerning the very same subject matter, with identical fact patterns and the same legal issues. A class action will promote a global resolution and will promote uniformity of

relief as to the Class Members and as to Defendants.

d. This lawsuit presents no difficulties that would impede its management by the Court as a class action. The class certification issues can be easily determined because the Class includes only CGM's client's customers, the legal and factual issues are narrow and easily defined, and the Class membership is limited. The Class does not contain so many persons that would make the Class notice procedures unworkable or overly expensive. The identity of the Class Members can be identified from Defendants' records, such that direct notice to the Class Members would be appropriate.

127. **Injunctive and Declaratory Relief, Fed. R. Civ. Proc. 23(b)(2):** In addition, Defendants have acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

128. Finally, all members of the proposed Class are readily ascertainable. CGM has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendants.

**COUNT I**
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Class)**

129. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

130. Defendants collected the PII of Plaintiff and the proposed Class Members and stored this information in their computer information technology systems.

131. Defendants had full knowledge of the sensitivity of the PII to which they were entrusted, and the types of harm that Plaintiff and the Class Members could and would suffer if the PII was wrongfully disclosed to unauthorized persons. Defendants had a duty to Plaintiff and each Class Member to exercise reasonable care in holding, safeguarding, and protecting that information.

132. Plaintiff and the Class Members were the foreseeable victims of any inadequate safety and security practices. Plaintiff and the Class Members had no ability to protect their data in Defendants' possession.

133. By collecting and storing this data in their computer systems, Defendants had a duty of care to use reasonable means to secure and safeguard it, to prevent disclosure of the information, and to safeguard the information from theft. Defendants' duty included a responsibility to implement processes by which it could

detect if that PII was exposed to the internet and to give prompt notice to those affected in the case of a data breach.

134. Defendants owed a common law duty of care to Plaintiff and the Class Members to provide adequate data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the PII.

135. In addition, Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

136. Defendants breached their duties, and were negligent, by acts of omission or commission, by failing to use reasonable measures to protect the Plaintiff's and Class Members' PII. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' PII;

b. Failing to adequately train employees on proper cybersecurity protocols;

c. Failing to adequately monitor the security of their networks and systems;

d. Failure to periodically ensure that their network system had plans in place to maintain reasonable data security safeguards;

e. Allowing unauthorized access to Plaintiff's and Class Members' PII;

f. Failing to timely notify Plaintiff and Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

137. It was foreseeable that Defendants' failure to use reasonable measures to protect Plaintiff's and Class Members' PII would result in injury to Plaintiff and Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyber-attacks and data breaches in the industry.

138. It was therefore foreseeable that the failure to adequately safeguard Plaintiff's and Class Members' PII would result in one or more types of injuries to them.

139. As a direct and proximate result of Defendants' negligence set forth in the preceding paragraphs, Plaintiff and Class Members have suffered injury and damages as set forth herein, including but not limited to fraudulent misuse of their

PII; loss of the opportunity to control how their PII is used; diminution in value of their PII; compromise and continuing publication of their PII; and are entitled to compensatory, actual, and punitive damages as a result of the Data Breach.

140. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class)**

141. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

142. Through their course of conduct, Defendant, Plaintiff, and Class Members entered into implied contracts for Defendants to provide services in connection with participating in the federal telecommunications and internet benefit programs, and that Defendants would deal with them fairly and in good faith, as well as implied contracts for Defendants to implement data security adequate to safeguard and protect the privacy of Plaintiff's and Class Members' PII entrusted to Defendants.

143. Specifically, Plaintiff and the Class Members entered into valid and enforceable implied contracts with Defendants when they first applied to receive or received Defendant's services.

144. The valid and enforceable implied contracts that Plaintiff and Class Members entered into with Defendants included Defendants' promise to protect nonpublic PII given to Defendants, or that Defendants created on their own, from unauthorized disclosures. Plaintiff and Class Members allowed their PII to be provided in reliance of that promise.

145. Defendants solicited and invited Plaintiff and Class Members to provide their PII, directly or indirectly, as part of Defendants' regular business practices. Plaintiff and Class Members accepted Defendants' offers and provided their PII to Defendants.

146. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendants' data security practices complied with industry standards and relevant laws and regulations, including the FTC Act.

147. Plaintiff and Class Members reasonably believed and expected that Defendants would adequately employ adequate data security to protect that PII. Defendants failed to do so.

148. Under the implied contracts, Defendants promised and were obligated to: (a) provide services to Plaintiff and Class Members; and (b) protect Plaintiff's and the Class Members' PII: (i) provided to obtain such services and/or (ii) created in connection therewith. In exchange, Plaintiff and Class Members agreed to pay money for these services and to turn over their PII.

149. Both the provision of these services, and the protection of Plaintiff's and Class Members' PII, were material aspects of these implied contracts.

150. Plaintiff and Class Members would not have entrusted their PII to Defendants and entered into these implied contracts with Defendants without an understanding that their PII would be safeguarded and protected, or entrusted their PII to Defendants, directly or indirectly, in the absence of their implied promise to monitor their computer systems and networks to ensure that PII was not disclosed to unauthorized parties and exposed to the public as occurred in the Data Breach.

151. A meeting of the minds occurred when Plaintiff and the Class Members agreed to, and did, provide their PII to Defendants and paid for services for, amongst other things, (a) the provision of such services and (b) the protection of their PII.

152. Plaintiff and the Class Members performed their obligations under the contracts when they paid for services, directly or indirectly, and provided their PII to Defendants.

153. Defendants materially breached their contractual obligations to protect the nonpublic PII of Plaintiff and the Class Members which Defendant required and gathered when the information was unauthorized disclosed in the Data Breach.

154. Under Georgia law, good faith is an element of every contract. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

155. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain and abuse of a power to specify terms.

156. Defendants materially breached their contractual obligations to deal fairly and in good faith with Plaintiff and the Class Members when it failed to take adequate precautions to prevent the Data Breach and failed to promptly notify them of the Data Breach.

157. The Data Breach was a reasonably foreseeable consequence of Defendants' conduct, by acts of omission or commission, in breach of these contracts.

158. As a result of Defendants' failure to fulfill the data security protections promised in these contracts, Plaintiff and Class Members did not receive the full benefit of their bargains, and instead received services that were of a diminished value compared to those described in the contracts. Plaintiff and Class Members were therefore damaged in an amount at least equal to the difference in the value of the services with data security protection they paid for and that which they received.

159. Had Defendants disclosed that their security was inadequate or that it did not adhere to industry-standard security measures, neither the Plaintiff, the Class Members, nor any reasonable person would have purchased services from Defendants.

160. As a direct and proximate result of the Data Breach, Plaintiff and the Class Members have suffered injury and damages as set forth herein and have been irreparably harmed, as well as suffering and the loss of the benefit of the bargain they had struck with Defendant.

161. Plaintiff and the Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

162. Plaintiff and the Class Members are also entitled to injunctive relief requiring Defendants to, e.g., (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**COUNT III**
**BREACH OF CONTRACT—THIRD PARTY BENEFICIARY**
**(On Behalf of Plaintiff and the Class)**

163. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

164. Plaintiff brings this claim in the alternate to his claim for Breach of Implied Contract (Count II).

165. Defendants entered into valid and enforceable contracts with their telecommunications and internet service provider clients, including but not limited to Assurance Wireless, and Q Link Wireless, under which Defendants would provide services in connection with federal telecommunications and internet benefit programs including ACP verification and enrollment, in exchange for payment, and which included obligations for Defendants to implement data security adequate to

safeguard and protect the privacy of Plaintiff's and Class Members' PII entrusted to Defendants.

166. Defendants solicited and invited its clients to pay monies in exchange for CGM's services, including requiring Plaintiff's and Class Members' PII, as part of Defendants' regular business practices, and CGM's partners accepted the offers and paid monies to CGM and provided the PII to Defendants.

167. Both the provision of these services and payment, and the protection of Plaintiff's and Class Members' PII, were material aspects of these contracts.

168. Plaintiff and the Class Members were the intended beneficiaries of these contracts as facilitating their participation in the FCC ACP and Lifeline federal benefit programs and saving them money on telephone and internet services.

169. These valid and enforceable contracts included Defendants' promise to protect nonpublic PII of Plaintiff and Class Members given to Defendants, or that Defendants created on their own, from unauthorized disclosures. Plaintiff and Class Members allowed their PII to be provided in reliance of that promise.

170. Defendants materially breached their contractual obligations to protect the nonpublic PII of Plaintiff and the Class Members which Defendants required and gathered when the information was unauthorized disclosed in the Data Breach.

171. Defendants materially breached their contractual obligations to deal

fairly and in good faith with Plaintiff and the Class Members when they failed to take adequate precautions to prevent the Data Breach and failed to promptly notify them of the Data Breach.

172. The Data Breach was a reasonably foreseeable consequence of Defendants' conduct, by acts of omission or commission, in breach of these contracts of which Plaintiff and the Class Members were the intended beneficiaries.

173. As a result of Defendants' failure to fulfill the data security protections promised in these contracts in which Plaintiff and the Class Members were the intended beneficiaries, Plaintiff and Class Members have suffered injury and damages as set forth herein and have been irreparably harmed, as well as suffering and the loss of the benefit of the bargain they had struck with Defendants or their telecommunications and internet service providers.

174. Plaintiff and the Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

175. Plaintiff and the Class Members are also entitled to injunctive relief requiring Defendants to, e.g., (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

176. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

177. Plaintiff brings this claim in the alternate to his claim for Breach of Implied Contract (Count II) and Breach of Contract—Third Party Beneficiary (Count III).

178. Plaintiff and proposed Class Members conferred benefits upon Defendants in the form of monies received by CGM, and in the form of valuable PII entrusted to Defendants.

179. Defendants appreciated or knew of these benefits that they received. And under principles of equity and good conscience, this court should not allow Defendants to retain the full value of these benefits—specifically, the monies, and PII of Plaintiff and members of the Class.

180. After all, Defendants failed to adequately protect Plaintiff's and Class Members' PII. And if such inadequacies were known, then Plaintiff and the members of the Class would never have conferred payment to Defendants, nor disclosed their PII.

181. As a result of Defendants' wrongful conduct as alleged herein, Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiff and the Class Members.

182. As a direct and proximate result of Defendants' unjust enrichment set forth in the preceding paragraphs, Plaintiff and Class Members have suffered injury and damages as set forth herein, including but not limited to fraudulent misuse of their PII; loss of the opportunity to control how their PII is used; diminution in value of their PII; compromise and continuing publication of their PII; and are entitled to damages as a result of the Data Breach.

183. Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

184. Under the common law doctrine of unjust enrichment, it is inequitable for Defendants to retain the benefits they received, and are still receiving, without justification, from Plaintiff and Class Members in an unfair, unconscionable, and oppressive manner. Defendants' retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

185. The financial benefits derived by Defendants rightfully belong to Plaintiff and Class Members. Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiff and Class Members all wrongful or

inequitable proceeds collected by Defendants. A constructive trust should be imposed upon all wrongful or inequitable sums received by Defendant traceable to Plaintiff and Class Members.

186. Plaintiff and the Class Members have no adequate remedy at law.

**COUNT V**
**INVASION OF PRIVACY—INTRUSION INTO PRIVATE AFFAIRS**
**(On Behalf of Plaintiff and the Class)**

187. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

188. The state of Georgia recognizes the tort of Intrusion into Private Affairs, and adopts the formulation of that tort found in the Restatement (Second) of Torts, which states:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person. Restatement (Second) of Torts § 652B (1977).

189. Plaintiff and the Class Members had a legitimate expectation of privacy to their PII and were entitled to the protection of this information against disclosure to unauthorized third parties.

190. Defendants owed a duty to Plaintiff and the Class Members to keep their PII confidential.

191. Defendants failed to protect said PII and exposed the PII of Plaintiff and the Class Members to unauthorized persons in the Data Breach.

192. Defendants allowed unauthorized third parties access to and examination of the PII of Plaintiff and the Class Members, by way of Defendants' failure to protect the PII.

193. The unauthorized release to, custody of, and examination by unauthorized third parties of the PII of Plaintiff and the Class Members is highly offensive to a reasonable person.

194. The intrusion was into a place or thing, which was private and is entitled to be private. Plaintiff's and the Class Members' PII was disclosed to Defendants in connection with CGM's services relating to federal telecommunications and internet benefit programs, but privately with an intention that the PII would be kept confidential and would be protected from unauthorized disclosure. Plaintiff and the Class Members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

195. The Data Breach constitutes an intentional or reckless interference by Defendants with Plaintiff's and the Class Members' interests in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

196. Defendants acted with a knowing state of mind when they permitted the Data Breach to occur because they had actual knowledge that their data security practices were inadequate and insufficient.

197. Defendants acted with reckless disregard for Plaintiff's and Class Members' privacy when they allowed improper access to their systems containing Plaintiff's and Class Members' PII.

198. Defendants were aware of the potential of a data breach and failed to adequately safeguard their systems and implement appropriate policies to prevent the unauthorized release of Plaintiff's and Class Members' PII.

199. Because Defendants acted with this knowing state of mind, they had notice and knew the inadequate and insufficient information security practices would cause injury and harm to Plaintiff and the Class Members.

200. As a direct and proximate result of the Defendants' invasion of privacy, the PII of Plaintiff and the Class Members was disclosed to third parties without authorization, causing Plaintiff and the Class Members to suffer injury and damages as set forth herein, including but not limited to fraudulent misuse of their PII; loss of the opportunity to control how their PII is used; diminution in value of their PII; compromise and continuing publication of their PII; and are entitled to damages.

201. Plaintiff and Class Members are also entitled to injunctive relief

requiring Defendants to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

202. Unless and until enjoined, and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class Members in that the PII maintained by Defendants can be viewed, distributed, and used by unauthorized persons for years to come. Plaintiff and the Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiff and the Class Members.

**COUNT VI,**
**VIOLATIONS OF THE CALIFORNIA CONSUMER PRIVACY ACT OF 2018**
**Cal. Civ. Code §§ 1798.100, *et seq.* ("CCPA")**
**(On Behalf of Plaintiff and the Class or alternatively the California Class)**

203. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

204. This claim is pleaded on behalf of Plaintiff and the Class, or alternatively, the California Class.

205. As more personal information about consumers is collected by

businesses, consumers' ability to properly protect and safeguard their privacy has decreased. Consumers entrust businesses with their personal information on the understanding that businesses will adequately protect it from unauthorized access.

206. As a result, in 2018, the California Legislature passed the California Consumer Privacy Act of 2018 ("CCPA"), giving consumers broad protections and rights intended to safeguard their personal information.

207. Among other things, the CCPA, Cal. Civ. Code §§ 1798.100(e), imposes an affirmative duty on certain businesses that maintain personal information about California residents to implement and maintain reasonable security procedures and practices that are appropriate to the nature of the information collected.

208. On information and belief, CGM is subject to the CCPA and failed to implement such procedures which resulted in the Data Breach.

209. Section 1798.150(a)(1) of the CCPA provides: "[a]ny consumer whose nonencrypted or nonredacted personal information, as defined [by the CCPA] is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business' violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for" statutory or actual damages, injunctive or declaratory relief, and any other relief the court deems proper.

210. Through the above-detailed conduct, Defendants violated the CCPA by subjecting the nonencrypted and nonredacted PII of Plaintiff and Class Members to unauthorized access and exfiltration, theft, or disclosure as a result of CGM's violation of its duty to implement and maintain reasonable security procedures and practices appropriate to the nature and protection of that information. Cal. Civ. Code § 1798.150(a).

211. Plaintiff is a "consumer" as defined by Civ. Code § 1798.140(g) because he is natural person residing in the state of California.

212. On information and belief, Defendants are each a "business" as defined by Civ. Code § 1798.140(c) because each are a legal entity that does business in the state of California and have annual revenues of in excess of $25,000,000.

213. The CCPA provides that "personal information" includes "[i]dentifiers such as a real name, alias, postal address, unique personal identifier, online identifier Internet Protocol address, email address, account name, social security number, driver's license number, passport number, or other similar identifiers." *See* Civ. Code § 1798.140.

214. Plaintiff's PII compromised in the Data Breach constitutes "personal information" within the meaning of the CCPA.

215. Through the Data Breach, Plaintiff's PII was accessed without authorization, exfiltrated, and stolen by criminals in a nonencrypted and/or nonredacted format.

216. The Data Breach occurred as a result of Defendants' failure to implement and maintain reasonable security procedures and practices appropriate to the nature of the information.

217. Concurrent with the filing of this Complaint, Plaintiff provides notice letter to Defendants pursuant to Cal. Civ. Code § 1798.150(b) identifying the specific provisions of the CCPA Plaintiff alleges Defendants has violated or is violating. Although a cure is not possible under the circumstances, if (as expected) Defendants are unable to cure or does not cure the violation within 30 days, Plaintiff will amend this Complaint to pursue actual or statutory damages as permitted by Cal. Civ. Code § 1798.150(a)(1)(A).

**COUNT VII**
**VIOLATION OF CALIFORNIA'S CONSUMER RECORDS**
**Cal. Civ. Code §§ 1798.82, *et seq.* ("CCRA")**
**(On Behalf of Plaintiff and the Class or alternatively the California Class)**

218. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

219. This claim is pleaded on behalf of Plaintiff and the Class, or alternatively, the California Class.

220. Section 1798.2 of the California Civil Code requires any "person or business that conducts business in California, and that owns or licenses computerized data that includes personal information" to "disclose any breach of the security of the system following discovery or notification of the breach in the security of the data to any resident of California whose unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Under Section 1798.82, the disclosure "shall be made in the most expedient time possible and without unreasonable delay…"

221. The CCRA further provides: "[a]ny person or business that maintains computerized data that includes personal information that the person or business does not own shall notify the owner or licensee of the information of any breach of the security of the data *immediately* following discovery, if the personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Cal. Civ. Code § 1798.82(b) (emphasis added).

222. Any person or business that is required to issue a security breach notification under the CCRA shall meet all of the following requirements:

> (A) The name and contact information of the reporting person or business subject to this section.
>
> (B) A list of the types of personal information that were or are reasonably believed to have been the subject of a breach.

> (C) If the information is possible to determine at the time the notice is provided, then any of the following: (i) the date of the breach, (ii) the estimated date of the breach, or (iii) the date range within which the breach occurred. The notification shall also include the date of the notice.
>
> (D) Whether notification was delayed as a result of a law enforcement investigation, if that information is possible to determine at the time the notice is provided.
>
> (E) A general description of the breach incident, if that information is possible to determine at the time the notice is provided.
>
> (F) The toll-free telephone numbers and addresses of the major credit reporting agencies if the breach exposed a social security number or a driver's license or California identification card number.
>
> (G) If the person or business providing the notification was the source of the breach, an offer to provide appropriate identity theft prevention and mitigation services, if any, shall be provided at no cost to the affected person for not less than 12 months along with all information necessary to take advantage of the offer to any person whose information was or may have been breached if the breach exposed or may have exposed personal information defined in subparagraphs (A) and (B) of paragraph (1) of subdivision (h).

Cal. Civ. Code § 1798.82(d)(2).

223. The Data Breach described herein constitutes a "breach of the security system" of CGM.

224. As alleged herein, it took over five (5) months for Defendants to begin informing Plaintiff and the Class or California Class Members about the Data Breach. CGM unreasonably delayed information to Plaintiff and Class Members

about the Data Breach, affecting their PII, after Defendant knew the Data Breach had occurred.

225. Defendants failed to disclose to Plaintiff and California Class Members, without unreasonable delay and in the most expedient time possible, the breach of security of their unencrypted, or not properly and securely encrypted, PII, when CGM knew or reasonably believed such information had been compromised.

226. Defendants' ongoing business interests gave CGM incentive to conceal the Data Breach from the public to ensure continued revenue.

227. Upon information and belief, no law enforcement agency instructed Defendants that timely notification to Plaintiff and California Class Members would impede its investigation.

228. As a result of Defendants' violation of Cal. Civ. Code § 1798.82, Plaintiff and the California Class Members or Class Members were deprived of prompt notice of the Data Breach and were thus prevented from taking appropriate protective measures, such as securing identity theft protection or requesting a credit freeze. These measures could have prevented some of the damages suffered by Plaintiff and Class Members because their PII would have had less value to identity thieves.

229. As a result of Defendants' violation of Cal. Civ. Code § 1798.82, Plaintiff and the California Class Members suffered incrementally increased damages separate and distinct from those simply caused by the Data Breach itself.

230. Plaintiff and California Class Members seek all remedies available under Cal. Civ. Code § 1798.84, including, but not limited to, to the damages suffered by Plaintiff and Class Members as alleged above and equitable relief.

231. Defendants' misconduct as alleged herein is fraud under Cal. Civ. Code § 3294(c)(3) in that it was deceit or concealment of a material fact known to CGM conducted with the intent on the part of Defendant depriving Plaintiff and Class Members of "legal rights or otherwise causing injury."

232. In addition, Defendants' misconduct as alleged herein is malice or oppression under Cal. Civ. Code § 3294(c)(1) and (c) in that it was despicable conduct carried on by CGM with a willful and conscious disregard of the rights or safety of Plaintiff and Class Members and despicable conduct that has subjected Plaintiff and Class Members to cruel and unjust hardship in conscious disregard of their rights.

233. As a result, Plaintiffs and Class Members are entitled to punitive damages under Cal. Civ. Code § 3294(a).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, JOSHUA WOLF, on behalf of himself, and all others similarly situated, prays for judgment as follows:

A. Trial by jury pursuant to Fed. R. Civ. Proc. 38(b) on all claims so triable;

B. An Order certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing his counsel to represent the Class;

C. Awarding Plaintiff and the Class damages that include applicable compensatory, actual, exemplary, and statutory damages, and punitive damages, as allowed by law;

D. Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

E. Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiff and the Class;

F. Awarding injunctive relief as is necessary to protect the interests of Plaintiff and the Class;

G. Enjoining Defendants from further deceptive practices and making untrue statements about the Data Breach and the transmitted PII;

H. Awarding attorneys' fees and costs, as allowed by law;

I. Awarding prejudgment and post-judgment interest, as provided by law;

J. Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and,

K. Any and all such relief to which Plaintiff and the Class are entitled.

Dated: June 16, 2023 Respectfully submitted,

**ALONSO & WIRTH**

*/s/ Joseph B. Alonso*
Joseph B. Alonso
GA Bar No. 013627
1708 Peachtree Street, NW Suite 207
Atlanta. GA 30309
(678) 928-4472
jalonso@alonsowirth.com

Lynn A. Toops*
Mary Kate Dugan*
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
(317) 636-6481
ltoops@cohenandmalad.com
mdugan@cohenandmalad.com

J. Gerard Stranch, IV *
Andrew E. Mize*
STRANCH, JENNINGS & GARVEY, PLLC
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203

(615) 254-8801
(615) 255-5419 (facsimile)
gstranch@stranchlaw.com
amize@stranchlaw.com

Samuel J. Strauss*
TURKE & STRAUSS, LLP
613 Williamson St., Suite 201
Madison, Wisconsin 53703
(608) 237-1775
(608) 509-4423 (facsimile)
sam@turkestrauss.com

*Motion for *Pro Hac Vice* Admission forthcoming

***Counsel for Plaintiff and the Proposed Class***

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1D, the attached pleading complies with the font and point selections prescribed by Local Rule 5.1B and uses 14 point Times New Roman Font.

*/s/ Joseph B. Alonso*
Joseph B. Alonso
Georgia Bar No. 013627